1   Dan Lawton (State Bar No. 127342)
    dlawton@lawtonlaw.com (Electronic mail)
2   Joseph C. Kracht (State Bar No. 228507)
    jkracht@lawtonlaw.com (Electronic mail)
3   LAWTON LAW FIRM
    Emerald Plaza
4   402 West Broadway, Suite 1860
    San Diego, CA 92101
5   (619) 595-1370 (Telephone)
    (619) 595-1520 (Facsimile)
6
7   Attorneys for Plaintiffs Glenn Robert Smith and Linda Smith

8               UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11  GLENN ROBERT SMITH, a natural    )   Case No.   '11 CV 0979 BTM WVG
    person, and LINDA SMITH, a natural )
12  person,                           )   COMPLAINT FOR DAMAGES
                                       )   AND PRELIMINARY AND
13              Plaintiffs,            )   PERMANENT INJUNCTIONS FOR
                                       )   INFRINGEMENT OF COPYRIGHT
14          v.                         )   AND UNFAIR COMPETITION
                                       )   AND FOR DECLARATORY
15                                     )   RELIEF
    BOB BAKER FAMILY FOUNDATION, a     )
16  tax-exempt, non-profit corporation;  HOLD )   DEMAND FOR TRIAL BY JURY
    AT ALL COSTS, LLC, a California limited )   AND FOR SPEEDY HEARING
17  liability company;  BOB BAKER MAZDA, )
    a business entity of unknown form;  and )
18  DOES 1-25,                         )
                                       )
19              Defendants.            )
                                       )
20  _____ )

21

22          For their claims for relief against defendants and pursuant to Fed. R. Civ. Proc.

23  8 and Form 19 thereto, plaintiffs Glenn Robert Smith and Linda Smith allege as

24  follows:

25                          <u>OVERVIEW</u>

26          1.      This action concerns infringement of Mr. Smith's copyrighted work, *i.e.*,

27  a documentary film entitled *Hold At All Costs: The Battle of Outpost Harry, Korea*

28

                                   1

1  (2010).  Defendants did this without Mr. Smith's consent and without accounting to

2  him for any of the profits which they stand to earn.  Defendants also committed other,

3  related, wrongs, all to Mr. Smith's damage and irreparable injury, as alleged

4  hereinbelow.

5                              <u>JURISDICTION AND VENUE</u>

6       2.      This action arises under the laws of the United States, including without

7  limitation the Federal Copyright Act, 17 U.S.C. § 101 *et seq.*, and 28 U.S.C. § 2201.

8       3.      This Court has jurisdiction over the subject matter of this action pursuant

9  to 28 U.S.C. §§ 1331, 1332(a)(1), 1338, and 1367.

10      4.      Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and

11  28 U.S.C. § 1400.

12                                   <u>THE PARTIES</u>

13      5.      Plaintiff Glenn Robert Smith a/k/a Glenn Palmedo-Smith ("Mr. Smith")

14  is a natural person and a resident of the County of San Diego, State of California.  Mr.

15  Smith is the sole shareholder of Dini Films International ("DFI"), a corporation

16  organized and existing under the laws of the State of California.  From time to time as

17  alleged hereinbelow, Mr. Smith used DFI as a fictitious business name for himself.

18  DFI's status with the California Secretary of State is currently shown as suspended.

19  Plaintiff Linda Smith ("Ms. Smith") is a natural person, a resident of the County of

20  San Diego, State of California, and the wife of Mr. Smith.

21      6.      Defendant Bob Baker Family Foundation (the "Foundation") is a tax-

22  exempt, non-profit corporation organized and existing under 26 U.S.C. § 501(c)(3);

23      7.      Defendant Hold at All Costs, LLC (the "LLC") is a California limited

24  liability company organized and existing under the laws of the State of California and

25  which has as its principal place of business and is doing business in San Diego,

26  California.  On information and belief, its members include the Foundation; Mr.

27  Smith and Ms. Smith; and the law firm of Dostart Clapp Gordon & Coveney LLP (the

28  "Dostart firm") (the Foundation's former law firm).  Mr. Smith and Ms. Smith served

1   as members of the LLC's Distribution and Exploitation Committee.  Per the statement
2   of information filed with the California Secretary of State on March 12, 2010, the
3   LLC's managers are the Foundation; DFI; and the Dostart firm.  Per the same
4   statement of information, the LLC's business is the "licensing of intellectual
5   property," *i.e.*, the licensing of rights in the film.  Attorney Paul J. Dostart is a
6   principal of the Dostart firm and the Foundation's former attorney.

7       8.     Defendant Bob Baker Mazda is a business entity of unknown form
8   organized and existing under the laws of the State of California, with its principal
9   place of business in the County of San Diego, State of California.  Bob Baker Mazda
10   purchases and sells new and used motor vehicles.

11       9.     The true names and capacities, whether individual, corporate, associate,
12   representative or otherwise, of DOES 1 through 25, inclusive, are unknown to
13   plaintiff, who therefore sues them by such fictitious names.  Plaintiffs will seek leave
14   to amend this complaint to show the true names and capacities of said defendants
15   when they are ascertained.  Plaintiffs are informed and believe, and thereupon allege,
16   that each of the defendants named as a Doe, along with the named defendants, is
17   responsible in some manner for the occurrences herein alleged, and that plaintiff's
18   injuries herein alleged were legally or proximately caused by said defendants.
19   Wherever it is alleged that any act or omission was also done or committed by any
20   specifically named defendant, or by defendants generally, plaintiffs intend thereby to
21   allege, and does allege, that the same act or omission was also done and committed by
22   each and every defendant named as a Doe, and each named defendant, both separately
23   and in concert or conspiracy with the named defendants.

24       10.     At all times mentioned herein, defendants, and each of them, were the
25   agents, servants, co-conspirators, or employees of one another, and the acts and
26   omissions herein alleged were done or suffered by them, acting individually and
27   through or by their alleged capacity, within the scope of their authority.  Each of the
28   defendants aided and abetted and rendered substantial assistance in the

1  accomplishment of the acts complained of herein.  In taking the actions, as

2  particularized herein, to aid and abet and substantially assist in the commission of the

3  misconduct complained of, each defendant acted with an awareness of his, her or its

4  primary wrongdoing and realized that his, her or its conduct would substantially assist

5  in the accomplishment of that misconduct and was aware of his, her or its overall

6  contribution to, and furtherance of the conspiracy, common enterprise, and common

7  course of conduct.  Defendants' acts of aiding and abetting included, *inter alia*, all of

8  the acts each defendant is alleged to have committed in furtherance of the conspiracy,

9  common enterprise, and common course of conduct complained of herein.

10                              THE COPYRIGHTED WORK

11       11.   Before March 16, 2011, Mr. Smith, a U.S. citizen, created, wrote, and

12  directed *Hold At All Costs: The Battle of Outpost Harry* (the "Copyrighted Work" or

13  the "film").  On March 17, 2011, Mr. Smith duly registered the Copyrighted Work

14  with the Writers Guild of America, which assigned the Copyrighted Work registration

15  no. 1493955.  The film was and is intended to document a bloody Korean war battle

16  between Chinese forces (on the one hand) and U.S. and Greek forces (on the other

17  hand) which took place at Outpost Harry on the Korean peninsula during the period

18  spanning June 10-18, 1953.  A reproduction of cover art taken from a DVD version of

19  the film accompanies this complaint as Ex. A.  On April 26, 2011, the Pacific

20  Southwest Chapter of the National Academy of Television Arts & Sciences

21  nominated the film for best documentary-historical and Mr. Smith for both (a) best

22  director post-production and (b) best writer-program (non-news).

23       12.   The Copyrighted Work is an original work that may be copyrighted

24  under U.S. law.

25       13.   Mr. Smith has filed a registration for a copyright in the Copyrighted

26  Work with the United States Copyright Office.  The Copyright Office has received

27  Mr. Smith's duly completed application form, nonrefundable filing fee, and

28  nonreturnable deposit of the Copyrighted Work.

14.   At all relevant times, Mr. Smith has remained the owner of the copyright.

15.   In registration filed with the U.S. Copyright Office on or about July 1, 2010, the Foundation improperly claimed ownership of the Copyrighted Work via "transfer: by written agreement" and improperly identified itself as an "employer for hire" who authored the "entire motion picture" constituting the film.  The Copyright Office assigned registration no. PA0001720897 to the registration made by the Foundation on or about that date.

### DEFENDANTS' WRONGFUL COURSE OF CONDUCT

16.   <u>The Grant Agreement</u>.  On September 18, 2008, Foundation and Smith entered into a letter agreement "re Grant Award and Agreement for Production of High Definition Public-Television Quality DVD-from high-definition DVD tentatively titled 'Hold At All Costs – the Battle of Outpost Harry, Korea 1953'" ("Grant Agreement").  A true and correct copy of the Grant Agreement accompanies this complaint as Ex. B.

17.   The draftsman of the Grant Agreement was Foundation's attorney, Dostart.  Through its president, Bob Baker, the Foundation consistently insisted that Mr. Smith not have an attorney present during any meetings concerning the film or anyone's rights therein.

18.   The Grant Agreement provided, *inter alia*, for the Foundation to grant $500,000.00 to Smith for production and delivery of the film, "suitable for release in Landmark-type theatres in the United States as a commercial documentary-movie[.]"  Afterward, the Foundation did not deliver the "tranches" of payments as promised in the Grant Agreement.

19.   The Grant Agreement also said, "[Smith] **shall** grant, assign, transfer and deliver to Foundation" a copyright in the film, including the "sole and exclusive right to commercially exploit [sic] the [film] . . . without duty to account or otherwise pay royalties . . ."  (Emphasis added.)   This language did not comprise a grant of the copyright in the film from Mr. Smith to the Foundation.  Instead, it was a mere

1  promise to assign rights in the future – not an immediate transfer of expectant

2  interests. *See Board of Trustees of the Leland Stanford Junior University v. Roche*

3  *Diagnostics Operations, Inc.*, 583 F.3d 832, 841 (Fed. Cir. 2009) (collecting cases),

4  *cert. granted*, ___ U.S. ___, 131 S.Ct. 502, 178 L.Ed.2d 368 (2010).  Mr. Smith's

5  copyright in the film survived the Grant Agreement and survives today.  Mr. Smith

6  has never granted to Foundation any copyright in the film or the Copyrighted Work.

7  Mr. Smith never believed that he signed away his copyright in the film, either in the

8  Grant Agreement or in any other agreement.

9      20.   The LLC.  Attorney Dostart invited Mr. Smith and his wife, Linda Smith,

10 to the Dostart firm's offices on December 17, 2009, for the purpose of discussing

11 formation of the LLC.  Dostart told the Smiths, "I need you to come in . . . I have a

12 proposition" for you.  Dostart began negotiating for a personal 10% stake in the film

13 and for the remaining percentages of ownership in the film to be divided as follows:

14 65% to Dostart's client, the Foundation, and 25% to the Smiths.

15     21.   Dostart registered the LLC with the California Secretary of State on or

16 about February 22, 2010.  The purpose of the LLC was to promote, exploit, and

17 distribute the film, with the financial backing of the Foundation.  On information and

18 belief, the Foundation assigned its rights in the film to the LLC so as not to jeopardize

19 its tax-exempt status with IRS.  It was contemplated that the LLC would collect

20 proceeds of DVD sales, reimburse any expenses advanced by the Foundation, and

21 distribute any profits to the Foundation (65%), the Smiths (25%), and either the

22 Dostart firm or Dostart himself (10%) afterward.  All parties had high expectations of

23 DVD sales to companies including Costco, Walmart, and other retailers; multi-

24 million dollar corporate sponsorship via name attachment; a 300-plus U.S. theatrical

25 distribution with Clark Film Buying, Clark Film Company, and Ultra Star Theaters;

26 and international broadcast rights in at least 16 countries.  Collectively, these

27 prospects promised returns in the millions of dollars.  On that basis, the Foundation's

28 Chief Financial Officer, Jeff Maxwell, told Mr. Smith that he was "gonna be a very

1   wealthy guy after this." Attorney Dostart assured the Smiths of vast profits as well.

2   Mr. Smith relied on these and other promises in devoting full time and exclusive

3   effort to the film for two years.

4         22.   The Smiths repeatedly have asked for (and, more recently, formally

5   demanded) a full copy of the LLC's operating agreement. Defendants and Dostart

6   have never provided him one, however (though they did deign to part with the first

7   page of the operating agreement only). The Smiths are informed and believe they are

8   members in good standing of the LLC and that the LLC has valuable intellectual

9   property rights in the film – rights which defendants continue, wrongfully, to deny.

10         23.   <u>Mr. Smith's Work on the Film</u>. Mr. Smith devoted his full time and

11   thousands of hours of his labor to the film for two years and until October 2010. The

12   scope of work initially included only fifteen (15) interviews; however, defendants

13   expanded the scope of work so that, in the end, Mr. Smith's work on the film included

14   interviews of over fifty (50) people. These included politicians, generals, world

15   leaders, historians, military experts, combat veterans (including Greek and People's

16   Liberation Army soldiers). Mr. Smith made multiple trips to China (three times),

17   South Korea (three times), Greece, Great Britain, and the east coast of the United

18   States (seven times). During much of his time spent editing the film, Mr. Smith lived

19   and slept in a $30 per night trailer in Los Angeles (in order to save lodging costs).

20   Mr. Smith lived and breathed the film seven (7) days a week. Principal photography

21   was scheduled to end in January 2010; defendants, however, significantly expanded

22   the scope of the film and ordered Mr. Smith to continue working after January 2010,

23   which he did. For example, in the first quarter of 2010, defendants told Mr. Smith to

24   travel to South Korea in order to interview the prime minister of South Korea for the

25   film. At defendants' request, Mr. Smith traveled again to South Korea in order to do

26   this interview, creating delays in his completion of the film that caused work to

27   continue well into April and May 2010. Defendants consented to these delays and,

28   indeed, brought them about (by expanding the scope of the film). Mr. Smith's work

1   included round-the-clock sessions with engineers and other industry professionals to

2   perfect the film's color and sound (in October 2010). Final audience test screenings

3   took place in October 2010. Mr. Smith delivered the completed film on October 21,

4   2010. The currently-planned air date for the film in May 2011. Until it began

5   withholding payment, the Foundation paid Mr. Smith $15,000 per month for his work

6   on the film.

7         24.   In early 2010, Mr. Smith was in financial distress, which was largely due

8   to his devotion of all of his waking hours and resources to his production of the film.

9   The demands of the film and the Foundation required Mr. Smith to neglect all other

10   work and long-term clients for over two (2) years (from about August 2008 through

11   the end of October 2010), while Mr. Smith worked exclusively on the film. Mr.

12   Smith's financial distress disabled him from remaining current on his rent and

13   coincided with the State of California attempting to garnish Mr. Smith's income in

14   order to satisfy a tax arrearage. Attorney Dostart advised Smith to file a personal

15   bankruptcy; he also suggested that defendants withhold Mr. Smith's pay for his work

16   on the film. Mr. Smith took Dostart's advice and filed for bankruptcy. Defendants

17   and attorney Dostart exploited Mr. Smith's financial distress as best they possibly

18   could. At Dostart's advice, in 2010 defendants began withholding payments from

19   Mr. Smith, aggravating his financial distress, using as an excuse a supposed

20   obligation to "honor the terms of the tax lien" imposed by the State on Mr. Smith.

21   The payments withheld were in the tens of thousands of dollars, and (in the fourth

22   quarter of 2010) exceeded $45,000.00. Defendants and attorney Dostart embarked on

23   a cold and mean campaign aimed at using Mr. Smith's financial distress to force Mr.

24   Smith to assign to the Foundation all of Mr. Smith's rights in the film – something

25   they would not have done had they truly believed that the Foundation owned the

26   copyright already. The Foundation's and Dostart's efforts amounted to extortion –

27   the deliberate and wrongful use of the implied threat of cutting Mr. Smith out

28

1   completely as a lever to extract a surrender of Mr. Smith's rights in the film from Mr. Sm

2       25.    Defendants exploited Ms. Smith as well.  Ms. Smith performed

3   bookkeeping services for the film, at an agreed-on monthly salary of $500.00.

4   Defendants withheld payment from her as well during the period between April and

5   October 2010, in the amount of $3,500.00.  Ms. Smith duly performed her

6   bookkeeping services all the while.

7       26.    In April 2010, Dostart also began insisting Mr. Smith lacked any rights

8   in the film whatsoever.  Dostart dangled to Mr. Smith the possibility of a settlement

9   of the parties' dispute over rights to the film whereby the Foundation would

10   acknowledge Mr. Smith's right to 25% of profits of the film.  Dostart also began

11   giving to Mr. Smith draft agreements which, if signed by Mr. Smith, would have

12   acknowledged the film was a "work-for hire," assigned his copyright to the

13   Foundation, and embodied a general release to all defendants. *See, e.g.*, Ex. C.

14   Attorney Dostart would not have delivered these documents had he not believed that

15   Mr. Smith owned the copyright in the film and that the film was not a "work-for-

16   hire." Mr. Smith, believing he owned the copyright in the film, refused to sign.

17       27.    Mr. Smith obtained a discharge from the Bankruptcy Court in October

18   2010.

19       28.    In November 2010, Mr. Smith was out of town working on the film.

20   Knowing this fact, the Foundation's president, Bob Baker, personally visited the

21   Smiths' home and accosted Mr. Smith's wife, Linda Smith.  At this time the

22   Foundation was withholding payment and expense reimbursements from Mr. Smith.

23   During his visit, Mr. Baker strongly suggested Mr. Smith had better sign the

24   agreement attorney Dostart was urging, under pain of the Foundation not paying Mr.

25   Smith for services rendered.  This was a calculated and blatant act of intimidation.

26       29.    Afterward, Mr. Smith repeatedly asked the Foundation to pay him some

27   $38,282.31 for services rendered ($45,000 for payment for work done from April 1

28   through mid-July 2010, less the purchase price of a used Mazda Tribute with over

80,000 miles on it which one of Bob Baker's dealerships sold to the Smiths in May 2010 for a nonnegotiable $6,717.72 after Linda Smith's 2000 Ford Explorer's engine failed)[1].  Dostart told Mr. Smith's attorney that the Foundation would do so – provided Mr. Smith deliver a general release (which would effectively cede any rights in the film to the Foundation).

30.  At all times before April 2010, defendants verbally assured the Smiths that they could expect to share in the film's profits.  Plaintiffs justifiably relied on these assurances.  Attorney Dostart relayed to Mr. Smith on August 13, 2010, the word of Foundation's president, Bob Baker, that he "will do the right thing with respect to this film . . . (after he receives the final [version] . . ."

31.  At all times, Mr. Smith acted in good faith and in the best interest of the film, and continues to do so.

32.  Mr. Smith completed the film.  The film has been enthusiastically received by those who have seen it and honored with rave reviews by test audiences and others who have previewed it.  In a letter to Mr. Smith dated February 25, 2011, American Public Television told Mr. Smith that the film "is a well-produced and important film that deserves wide visibility" and lauded as "exceptional" the "inclusion of the Chinese point of view in the film as well as the trove of American participants and expert commentary[.]" In the same letter, American Public Television told Mr. Smith its sales division was "strongly interested in representing [the film] to media buyers worldwide" and also suggested home video distribution.

33.  The Foundation discharged attorney Dostart and replaced him with attorney Wade Poulson in early 2011.

34.  On February 8, 2011, the Foundation told Mr. Smith the Foundation had "terminated all working relationships and services being performed in relation to" the

---

[1]  Baker paid the Smiths $400 for the Ford.  On information and belief, its value was many multiples of this.

1  film and that the "Foundation will not be retaining your services at any time in the
2  future." Afterward the Foundation's president, Bob Baker, refused to meet with Mr.
3  Smith and had his attorney Poulson chastise Mr. Smith for trying to communicate
4  with Mr. Baker directly.

5          35.    Mr. Smith has notified defendants in writing of their infringements.
6  Defendants, however, have continued to infringe the copyright by continuing to air
7  the film in violation of the copyright, and further have engaged in unfair trade
8  practices and unfair competition in connection with their airing of the film, all to the
9  irreparable damage of Mr. Smith.

10         36.    To add insult to injury, the used Mazda which Mr. Baker sold to the
11  Smiths was a lemon.  Beginning in May 2010, the vehicle stalled on several
12  occasions.  On June 2010, the Smiths took the car into Baker Mazda in Carlsbad for
13  repairs.  The Smiths again took the car in for repairs on July 29, 2010, because of an
14  engine light.  Baker Mazda replaced the vehicle's water pump.  During the same
15  month the Smiths determined the tires on the car were unsafe; the Smiths replaced
16  them, at a cost of $500.000.  In November 2010, when the car again needed repairs,
17  Baker Mazda recommended various parts be replaced at a cost of $700 – knowing the
18  Smiths had not been paid for six months and probably lacked the money.  In March
19  2011, the car again stalled (on the freeway); the Smiths had it towed to Baker Mazda
20  for repair.  On this occasion Baker Mazda told the Smiths the car was "worthless" and
21  that, if they didn't remove it, then Baker Mazda would contact Carlsbad Police and
22  the District Attorney.  The Smiths left the lemon sold to them by Baker on the lot.

23                       <u>FIRST CLAIM FOR RELIEF</u>
24                      (for Direct Copyright Infringement)
25             (By Mr. Smith only Against Defendants Foundation and LLC)
26         37.    Plaintiffs reallege and incorporate by reference as though fully set forth
27  preceding paragraphs 1 through 36.
28

38.   Mr. Smith's work is a copyrighted work.  Mr. Smith has duly filed for registration of the Copyrighted Work.  Under the U.S. Copyright Act, Mr. Smith has exclusive rights, *inter alia*, to reproduce the Copyrighted Work, to prepare derivative works based on the Copyrighted Work, and to distribute copies of the Copyrighted Work to the public.  See 17 U.S.C. §§ 106(1), (2), (3).

39.   Through their conduct averred hereinabove, defendants have directly infringed Mr. Smith's copyright in the Copyrighted Work by reproducing, adapting, and/or distributing the film (which embodies the Copyrighted Work) without authorization in violation of the Copyright Act.  See 17 U.S.C. §§ 106, 501.  Defendants shortly will cause copies of the Copyrighted Work to be distributed within the United States via national television.

40.   Mr. Smith did not authorize defendants' copying, display or distribution of infringing copies of his work.

41.   Defendants knew that the film infringed Mr. Smith's copyright and that they lacked permission to exploit the Copyrighted Work.

42.   Defendants knew that their acts comprised copyright infringement.

43.   Defendants' infringements were knowing, willful, negligent, in disregard of and with indifference to the rights of Mr. Smith.

44.   Defendants have the right and ability to supervise and control ongoing infringements by third parties, including infringements by those who – with the authorization, approval and consent of defendants – advertise and air the film in the United States.  Defendants have refused and failed to exercise supervision and control over said third parties.  Defendants also stand to reap a direct pecuniary benefit from their infringements.

45.   The aforementioned infringements occurred in whole or in part within the territorial boundaries of the United States and/or its territories.

46.   Each airing of the film constitutes a separate and distinct act of infringement.

47.   As a result of their wrongful conduct, defendants are liable to Mr. Smith for copyright infringement pursuant to 17 U.S.C. § 501.  Mr. Smith has suffered, and will continue to suffer, substantial damages.  Mr. Smith is entitled to recover damages, which include his losses and any and all profits defendants have collected as a result of their wrongful conduct.  In the alternative, Mr. Smith is entitled to statutory damages under § 504(a) and (c).

48.   As a direct and proximate result of defendants' infringements, Mr. Smith has suffered and will continue to suffer substantial, immediate, and irreparable injury, for which no adequate remedy at law exists.  Unless enjoined by this Court, defendants will continue to infringe Mr. Smith's copyright.

SECOND CLAIM FOR RELIEF

(By Mr. Smith only for Direct Copyright Infringement (Distribution))

(Against Defendants Foundation and LLC)

49.   Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 48.

50.   Defendants, without Mr. Smith's consent or permission, are distributing Mr. Smith's Copyrighted Work and derivative works based on the Copyrighted Work to the public by making available to television viewers the film.  Defendants' conduct comprises direct infringement of Mr. Smith's exclusive rights under the Copyright Act to distribute his Copyrighted Work to the public.  17 U.S.C. § 106(3).

51.   Defendants' infringements have been willful, intentional, and purposeful, in disregard of and indifferent to Mr. Smith's rights.

52.   Defendants have continued to infringe the Copyrighted Work.

53.   As a direct and proximate result of defendants' infringements, Mr. Smith is entitled to actual damages plus defendants' profits from infringement pursuant to 17 U.S.C. § 504.  In the alternative, Mr. Smith is entitled to statutory damages under § 504(a) and (c).

54.     Mr. Smith is entitled to costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

55.     Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Mr. Smith great and irreparable injury that cannot fully be compensated or measured in money.  Mr. Smith lacks an adequate remedy at law. Pursuant to 17 U.S.C. § 502, Mr. Smith is entitled to a permanent injunction requiring defendants to employ reasonable methods to prevent infringement of the Copyrighted Work.

### THIRD CLAIM FOR RELIEF

(By Mr. Smith only for Unfair Competition under California's UCL)

(Against Defendants Foundation and LLC)

56.     Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 55.

57.     Defendants' business practices as alleged hereinabove comprise unfair competition and unfair business practices and business acts in violation of California's unfair competition law, California Business & Professions Code §17200 *et seq*.

58.     Without injunctive relief, Mr. Smith has no means by which to control defendants' unlawful copying and distribution of his Copyrighted Work.  Pursuant to California Business & Professions Code § 17203, the Court should enjoin these practices, including, *inter alia*, any further broadcast or display of the film except on Mr. Smith's permission.

### FOURTH CLAIM FOR RELIEF

(By Mr. Smith only for Unfair Competition under the Common Law of California)

(Against Defendants Foundation and LLC)

59.     Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 58.

60.   Defendants' business practices as alleged hereinabove comprise unfair competition and unfair business practices under the common law of the State of California.

61.   As a direct and proximate result of defendants' business practices, Mr. Smith has suffered and will continue to suffer lost profits in an amount not yet fully ascertained, in an amount to be proven at trial.

FIFTH CLAIM FOR RELIEF

(for Declaratory Relief)

(Against Defendants Foundation and LLC)

62.   Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 61.

63.   There now exists an actual controversy within this Court's jurisdiction as to the parties' rights and liabilities under the Grant Agreement and the LLC's operating agreement (the latter which defendants continue to withhold from Mr. Smith).  The Smiths are interested parties entitled to a declaration of those rights and liabilities under 28 U.S.C. § 2201(a), pursuant to which the Court should fashion a decree stating those rights and liabilities, including, *inter alia*, Mr. Smith's ownership of the copyright to the film and/or the proceeds of commercial exploitation thereof and Mr. Smith's membership interest in the LLC.

SIXTH CLAIM FOR RELIEF

(By Mr. Smith only for Breach of Oral Contract)

(Against Defendants Foundation and LLC)

64.   Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 63.

65.   The parties were capable of contracting in 2008 and afterward.  The parties agreed that Mr. Smith would enjoy a 25% share in the film's profits in return for the significantly expanded work on the film which the Foundation asked him to perform in 2009 and 2010.  The expansion in the scope of the film required new

15

1  consideration apart from what the Grant Agreement provided.  Because the

2  Foundation feared loss of its tax-exempt status if it were seen to collect profits of

3  exploitation of the film, it directed attorney Dostart to set up the LLC, which was

4  intended as a vehicle for commercial exploitation of the film.  Mr. Smith agreed to

5  continue to devote his full time and exclusive efforts to the film in 2010 on these

6  terms, and did so, completing and delivering the film in October 2010.  Both the

7  Foundation and the LLC benefitted directly from Mr. Smith's work, and each was

8  obliged to pay Mr. Smith in accordance with the terms of the parties' oral contract.

9  After Mr. Smith delivered the completed film, however, defendants reneged on the

10  oral contract, and stated their intent to exclude Mr. Smith from any participation in

11  the film's profits.  As a direct and proximate result, Mr. Smith has suffered general

12  and special damages in an amount to be proven at trial.

SEVENTH CLAIM FOR RELIEF

(By Mr. Smith only for Promissory Estoppel)

(Against Defendants Foundation and LLC)

16 17  66.    Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 65.

18  67.    Defendants repeatedly promised Mr. Smith he would share in at least

19  25% of the profits of exploitation of the film.  Defendants, through the Foundation's

20  CFO, Jeff Maxwell, told Mr. Smith that he was "gonna be a very wealthy guy after

21  this" – an overt reference to defendants' previous promises of sharing in the film's

22  profits.  On multiple occasions during the near-weekly LLC committee meetings that

23  the Smiths attended over a five-month period, Dostart reminded the committee of the

24  vast wealth the film would generate, well into the millions of dollars.  These repeated

25  promises induced both action and forbearance by Mr. Smith – action, in the form of

26  Mr. Smith's continued work on the film to the exclusion of all other work; and

27  forbearance, in the form of Mr. Smith's forbearance from enforcing the rights of

28

1   which he now seeks vindication.  This action and forbearance comprised reliance, to

2   Mr. Smith's detriment, on defendants' promises.

3       68.    Had Mr. Smith known defendants secretly intended to exclude him from

4   any participation in the film's profits and to deny his copyright, he never would have

5   continued work on the film nor would he have forborne from enforcement of his

6   rights.  Mr. Smith's action and forbearance comprised consideration given in

7   exchange for the promises he now seeks to enforce by this action.

8       69.    Injustice can be avoided only by enforcement of defendants' repeated

9   promises.

10      70.    As a direct and proximate result of his detrimental reliance on

11  defendants' broken promises, Mr. Smith has suffered damages in an amount to be

12  proven at trial.

13      71.    In the alternative, and in order to avoid the injustice which would

14  otherwise result, the Court should order defendants to perform the promises which

15  they made to Mr. Smith, without which Mr. Smith will suffer irreparable harm.

16                          EIGHTH CLAIM FOR RELIEF

17                      (By Mr. Smith only for Promissory Fraud)

18                    (Against Defendants Foundation and LLC)

19      72.    Plaintiffs reallege and incorporate by reference as though fully set forth

20  preceding paragraphs 1 through 71.

21      73.    Defendants made misrepresentations to Mr. Smith and concealed the true

22  facts from Mr. Smith.  They falsely told Mr. Smith that he would share in at least 25%

23  of the profits of the film and that he was "gonna be a very wealthy guy after this."

24  They withheld from Mr. Smith their true intent, which was to deny Mr. Smith any

25  share in any of the profits of the film and to deny Mr. Smith's copyright.

26      74.    In making these misrepresentations and concealing the truth, defendants

27  acted with knowledge of the falsity of the statements and of the reality that, by

28  omitting to tell the truth, they rendered misleading the statements which they did

1  utter.  In so doing, they intended to – and did – induce Mr. Smith to rely on them so

2  that Mr. Smith would continue his work and complete the film.  Defendants knew that

3  Mr. Smith was (and is) a talented film maker who could not be replaced if the film

4  was to be of the high quality defendants demanded.

5      75.    Mr. Smith relied justifiably on what he was told and was unaware of the

6  truth, which defendants and their lawyer, Dostart, concealed from him until after Mr.

7  Smith delivered the completed film and no longer had any significant bargaining

8  power vis-a-vis defendants.

9      76.    As a direct and proximate result of defendants' fraud, Mr. Smith has

10  suffered damages in an amount to be proven at trial.

11      77.    Defendants made their misrepresentations and omissions in a way which

12  was malicious, fraudulent, and oppressive and in deliberate disregard of Mr. Smith's

13  rights.  Defendants sought deliberately to take advantage of Mr. Smith's financial

14  woes in 2010.  Bob Baker sought deliberately to exclude Mr. Smith from having

15  counsel in meetings so that he could enjoy maximum advantage in any negotiations

16  with Mr. Smith, an unsophisticated layperson with no legal knowledge or training.

17  Knowing that Mr. Smith was away working on the film, Mr. Baker made an

18  unscheduled and intimidating visit to Mr. Smith's home, where he tried to bully Mr.

19  Smith's wife into persuading Mr. Smith to release all of his rights or else not be paid

20  for the work he had done.  All of these acts were done with meanness and calculation.

21  As a result, Mr. Smith is entitled to an award of exemplary damages so as to make an

22  example of defendants and deter others from similar misconduct in the future.

<u>NINTH CLAIM FOR RELIEF</u>

(By Mr. Smith only for Breach of Written Contract)

(Against Defendant Foundation)

26      78.    Plaintiffs reallege and incorporate by reference as though fully set forth

27  preceding paragraphs 1 through 77.

28

79.    Among other things, the Grant Agreement obliged the Foundation to enter into negotiations with Mr. Smith for rights to commercial distribution and exploitation of the film.  The Grant Agreement labeled these rights "First Negotiating Rights" and the negotiations concerning them "Distribution Negotiations."  The stated goal of the Distribution Negotiations was agreement on financial terms and "performance metrics" for commercial distribution of the film on a basis that awarded to "persons other than the Foundation" (*i.e.*, Mr. Smith or his affiliates) no more than 30% of "Net Exploitation Revenues" received from all forms of exploitation of the film before January 1, 2018.

80.    All conditions to these First Negotiating Rights and Distribution Negotiations which were not waived, excused, or discharged occurred.

81.    Afterward, however, Foundation did not enter into Distribution Negotiations or, if it did, did so in a way so perfunctory and cursory as to bespeak its intent never to share any proceeds of the film with Mr. Smith (or anyone else).  This was a breach of the Grant Agreement.

82.    As a direct and proximate result of this breach, Mr. Smith has suffered general and special damages in amounts to be proven at trial.

<u>TENTH CLAIM FOR RELIEF</u>

(By Mr. Smith only for Bad Faith)

(Against Defendants Foundation and LLC)

83.    Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 82.

84.    The Grant Agreement contained an implied covenant of good faith and fair dealing.  This covenant obliged the Foundation to refrain from doing anything which would unfairly interfere with Mr. Smith's right to receive the benefits of the Grant Agreement.

85.     The Foundation violated this covenant.  This was despite the fact Mr. Smith did all, or substantially all, of the significant things that the Grant Agreement obliged him to do or that he was excused from having to do.

86.     All conditions for the Foundation's performance which were not waived, excused, or discharged existed.

87.     The Foundation unfairly interfered with Mr. Smith's right to receive the benefits of the Grant Agreement.  These benefits included, *inter alia*, proceeds of commercial exploitation of the film, as well as public recognition of Mr. Smith's efforts by broadcast outlets and others.

88.     As a direct and proximate result of the Foundation's breach of the implied covenant of good faith and fair dealing, Mr. Smith has been damaged in an amount to be proven at trial.

ELEVENTH CLAIM FOR RELIEF

(for Quantum Meruit)

(By Ms. Smith only Against Defendants Foundation and LLC)

89.     Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 88.

90.     In January 2010, Dostart received a bid to organize a premiere screening of the film at the Kennedy Center in Washington, D.C.  The bid came from a Washington, D.C.-based party planner and was for $60,000.00.  Defendants arranged for Linda Smith to do the work instead.  Ms. Smith worked from January through June 2010 organizing the premiere screening of the film at the Kennedy Center.  She performed all of the work that the party planner would have done (and for which the party planner would have charged $60,000.00), thus saving the LLC $60,000.00.  Defendants also arranged for Ms. Smith to plan a private luncheon for dignitaries Edward Herrmann and Generals John Singlaub and Paik Sun Yup at the Mayflower Hotel in Washington, D.C.; coordinate other screenings of the film and ancillary

events in Fort Stewart, Georgia and San Diego, California.  Defendants neither paid nor offered to pay Ms. Smith for this work.

91.    Defendants induced Ms. Smith to perform this work by reminding her that she (along with Mr. Smith) would share in the film's profits.  Had it not been for these promises, Ms. Smith would not have taken such action.

92.    Ms. Smith is entitled to a decree ordering defendants to compensate her for the reasonable value of her services described hereinabove.

TWELFTH CLAIM FOR RELIEF

(for Fraud and Deceit in Sale of Mazda Tribute)

(Against Defendant Bob Baker Mazda Only)

93.    Plaintiffs reallege and incorporate by reference as though fully set forth preceding paragraphs 1 through 92.

94.    In May 2010, plaintiffs purchased a used Mazda Tribute from Bob Baker Mazda under a written contract of sale under which plaintiffs agreed to pay $6,717.72.

95.    Plaintiffs are consumers who purchased the vehicle for personal and family use.

96.    Bob Baker Mazda purchased the vehicle in used condition and resold it to plaintiffs.  Bob Baker Mazda acted at the direction of its proprietor and the Foundation's president, Bob Baker, at all relevant times.

97.    When sold to plaintiffs, the vehicle was dangerously defective.  Among other defects, it was prone to stalling; had dangerously worn tires; and had a faulty water pump.  The vehicle stalled several times after Bob Baker Mazda unloaded it onto plaintiffs, including on the freeway.

98.    Bob Baker Mazda owed plaintiffs the duty to disclose the vehicle's dangerous defects to plaintiffs.  Bob Baker Mazda, however, concealed these defects from plaintiffs, "hustling" them into a sale under the duress of the financial distress the Smiths were then suffering.  Had plaintiffs known the true facts, they would not

1  have agreed to trade in their 2000 Ford Explorer for only $400, nor to pay $6,717.72

2  for a dangerously defective vehicle.

3       99.   Bob Baker Mazda's concealment of the facts amounted to fraud and

4  deceit under applicable law.  The vehicle was worthless at the time of sale to

5  plaintiffs and is worthless today.

6       100.   As a direct and proximate result of Bob Baker Mazda's fraud and deceit

7  in the sale of the vehicle, plaintiffs are entitled to rescission under California Civil

8  Code § 1689, and to restitution and damages pursuant to California Civil Code §

9  1692.

10                      <u>PRAYER FOR RELIEF</u>

11       WHEREFORE, plaintiffs pray for relief as follows:

12       A.   Until this case is decided, defendants and their agents be enjoined

13  preliminarily and permanently from the manufacture, publication, display,

14  distribution, advertising, sale, promotion, or airing of the film and any other work

15  which infringes Mr. Smith's copyright in the Copyrighted Work;

16       B.   That defendants account for an pay as damages to Mr. Smith all profits

17  and advantages gained from unfair trade practices and unfair competition in airing the

18  film and all profits and advantages gained from infringing Mr. Smith's copyright (but

19  no less than the statutory minimum);

20       C.   That defendants deliver for impoundment all copies of the film and the

21  Copyrighted Work in their possession or control and deliver for destruction all

22  infringing copies and all materials for making infringing copies;

23       D.   That the Court declare defendants to have willfully infringed Mr.

24  Smith's copyright in the Copyrighted Work;

25       E.   That the Court order defendants to disgorge and account to Mr. Smith for

26  any and all profits derived by defendants from the manufacture, production,

27  publication, distribution, advertisement, airing, and/or any other exploitation of the

28  film;

1        F.     That the Court assess against defendants pre-judgment and post-

2  judgment interest, reasonable attorney's fees, and costs of suit against defendants, and

3  that the Court award such interest, fees and costs to Mr. Smith;

4        G.     That the Court award Mr. Smith a permanent injunction against further

5  broadcast, airing or display of the film as a result of its statutory and common law

6  unfair competition;

7        H.     For an award of actual damages suffered as a result of defendants'

8  common law unfair competition;

9        I.     For an accounting from each defendant of all monies generated from the

10  broadcast, airing, and/or display of the film, so that the Court may determine properly

11  the full extent of Mr. Smith's damages;

12        J.     For declaratory relief decreeing the parties' rights and liabilities vis-a-vis

13  the film and the LLC;

14        K.     For general and special damages according to proof at trial for

15  defendants' breaches of contract, promissory fraud, and promissory estoppel;

16        L.     For a decree obliging defendants to perform their oral promises to share

17  the profits of the film with Mr. Smith;

18        M.     For an award of exemplary damages in an amount sufficient to punish

19  defendants and deter others from similar misconduct in the future;

20        N.     For a decree ordering defendants to compensate Ms. Smith the

21  reasonable value of her services;

22        O.     For a decree of rescission and restitution as to the vehicle, or, in the

23  alternative, for general and special damages as to the vehicle as may be proven at

24  trial;  and

25        P.     For such other and further relief as this Court may deem just and proper.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated: May 5, 2011                    LAWTON LAW FIRM

By:   /s/Dan Lawton
      Dan Lawton
      Attorney for Plaintiffs Glenn Robert Smith and Linda
      Smith

1  <u>DEMAND FOR TRIAL BY JURY AND FOR SPEEDY TRIAL</u>

2  Plaintiffs hereby demand a trial by jury as to all issues triable by jury a speedy

3  trial pursuant to Fed. R. Civ. P. 57.

4  Respectfully submitted,

5  Dated: May 5, 2011       LAWTON LAW FIRM

6

7  By:   /s/Dan Lawton
       Dan Lawton
8       Attorney for Plaintiffs Glenn Robert Smith and Linda
       Smith
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS
GLENN ROBERT SMITH

## DEFENDANTS
BOB BAKER FOUNDATION, a tax-exempt, non-profit corporation; HOLD AT ALL COSTS, LLC, a California limited liability company; and DOES 1-25

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
LAWTON LAW FIRM
Emerald Plaza
402 West Broadway, Suite 1860
San Diego/CA/92101
(619) 595-1370

ATTORNEYS (IF KNOWN)

**'11CV0979 BTM WVG**

## II. BASIS OF JURISDICTION  (PLACE AN 'X' IN ONE BOX ONLY)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES  (PLACE AN 'X' IN ONE BOX FOR
(For Diversity Cases Only)                    PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)  17 U.S.C. section 101 et seq. Infringement of copyright to "Hold At All Costs: The Battle of Outpost Harry, Korea (2010)."

## V. NATURE OF SUIT  (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Medical Malpractice | ☐ 625 Drug Related | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | Seizure of | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | Property 21 USC 881 | ☒ 820 Copyrights | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 153 Recovery of Overpayment | ☐ 345 Marine Product | ☐ 371 Truth in Lending | Safety/Health | ☐ 862 Black Lung (923) | Exchange |
| of Veteran's Benefits | Liability | ☐ 380 Other Personal | ☐ 690 Other | ☐ 863 DIWC/DIWW | ☐ 875 Customer Challenge |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | Property Damage | **LABOR** | (405(g)) | 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle | ☐ 385 Property Damage | ☐ 710 Fair Labor | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | Product Liability | Product Liability | Standards Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization |
| **REAL PROPERTY** | ☐ 360 Other Personal Injury | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | **CIVIL RIGHTS** | ☐ 510 Motion to Vacate | ☐ 730 Labor/Mgmt. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | Sentence | Reporting & | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | **HABEAS CORPUS:** | Disclosure Act | ☐ 871 IRS - Third Party | ☐ 895 Freedom of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | ☐ 530 General | ☐ 740 Railway Labor Act | 26 USC 7609 | Information Act |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | | ☐ 900 Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | | Determination Under |
| | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | Security Act | | Equal Access to Justice |
| | | ☐ 555 Prison Conditions | | | ☐ 950 Constitutionality of |
| | | | | | State Statutes |
| | | | | | ☐ 890 Other Statutory Actions |

## VI. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removal from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23     DEMAND $ 0.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES  ☐ NO

## VIII. RELATED CASE(S)
IF ANY            (See instructions):     JUDGE _____     Docket Number _____

DATE
May 4, 2011

SIGNATURE OF ATTORNEY OF RECORD

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)